Stage number 20-1317 et al. Sierra Club et al petitioners v. United States Department of Transportation et al. Mr. Marshall for the environmental petitioners, Mr. Wissigman for the state petitioners, Mr. Renshi for the petitioner QLF Tribe of Indians, Ms. Jaffe for the respondents. Good morning, your honors. May it please the court. Bradley Marshall on behalf of environmental petitioners, I'd like to reserve 3 minutes for rebuttal. This is a petition for review of a final rule approving the transportation of liquefied natural gas by rail. There are two main issues I'd like to address today that merit vacating the LNG by rail rule. First, the lack of opportunity for notice and comment on the new tank car design in the final LNG rule in violation of the Administrative Procedures Act. And second, the inadequate consideration of safety in the final LNG rule in violation of the Administrative Procedures Act and the Hazardous Materials Transportation Act. First, the lack of opportunity for public comment. Throughout the proposed LNG rule, PHMSA emphasized the opportunity to comment on possible operational controls, even though such controls were not proposed, but ultimately did make their way into the final rule. Environmental petitioners, of course, take no issue with that from a notice and comment perspective. At the same time, PHMSA specifically rejected the possibility of considering an alternative tank car design as requiring additional study. It only required one particular form, but they have a whole section asking for information about tank car design and tank car specifications. They had two things they were clearly asking about. Subsection A, 3A is tank car specifications, and 3B is operational controls. So they were looking for both. With respect to your honor, if you look at that section, it specifically talks about the tank car design of the DOT 113C120. So it wasn't just an operational controls. They were asking about tank car specifications. They referenced that particular one. The way you've argued it is that the only thing they wanted information on was operational controls, but the NPRM talks about both. People commented about both, including your clients. So to the extent you're arguing that we knew about operational controls, we didn't know the tank car specifications were on the table. It just seems hard to reconcile with the text of the NPRM and the responses to it. We didn't know that possibly altering the tank car specifications were on the table. Throughout the proposed rulemaking, FINSA emphasized the existing tank car and the existing operational and safety history of the existing tank car. At no point was there even any hint that they were considering modifying or proposing a new type of tank car. It talks about tank car specifications. NTSB and others talked about all forms of tank car specifications, including thickness of the hull. And the agency responded to it. And so I'm having trouble understanding how there wasn't notice. They said we want both these things. We want to consider the DOT 113, the suitability of the existing tank car. If you look at the proposed regulatory impact assessment. Well, why isn't it if someone says, I want to know, tell me about the suitability of this car. And you go, not suitable. I've got to get 12 people in. I need a minivan. Right? That's a response. They say, tell me if this car is suitable. And you go, it's not. You need this. That's a common response. Is it not? Well, it would be if they said, there's another option. Here's the minivan. Really, if I say, I think for your family of 12, I think this compact car here would be great for you. Here's its fuel efficiency. What do you think? And you would say, that's not going to work for us. Right. You're right. That's what we said. I wouldn't say that. You say, I need something bigger. Would be the first thing you would say. I just don't understand why it seems illogical to think that they were tying everyone, they're muting everybody to even mention things that could do to make even this car or another car stronger. The tank car specifications means we want to talk about tank car specifications. That is not how they worded it. That is not how they invited comments. So even if it's a logical outlook because tank car design was on the table, isn't it arbitrary and capricious to say that this solves all our problems? Let's just go to nine sixteenths of an inch thickness and that's going to address the fireballs and the vapor clouds and all that stuff. Absolutely, your honor. And in addition to that, there's attendant higher weight issues that no one had the opportunity to comment on because this tank car that they've designed wasn't in anyone's imagination and they didn't put it out there that imagine a new tank car for us and design what you think would be a safe tank car. There were tank cars with nine sixteenths of an inch thickness because there's something in the record about a quarter of them still punctured upon derailment. Correct, your honor. There were some of these nine sixteenths. Not of the double hull DOT 113 that we're talking about. You're talking about a different kind of tank car that did have the attendant higher thickness to show what would the outer shell, what could that look like? That is in the record. The core still breached at a significantly lower speed. Like a double walled one? That was not a double wall. Oh, I see. So there is no data about whether that would puncture on a derail, the newly designed tank? Correct. There was no data. This is a new tank car that had never been designed before, never been created before, and there was no notice that they were thinking about creating a new tank car. In the proposed regulatory impact assessment, they were doing, they were acting within the question is logical outgrowth or not, right? And they were dealing within the realm of tank car specifications, increasing hull thickness is on the table. That's an ordinary thing. It's not like they said, okay, let's try a flying thought that doesn't exist, right? They said, here's something that is routinely done to increase safety. And we're already going to have the double tank system here, which has safety protections. We're going to maximize it because there's lots of concerns. We hear you about the safety issues, and here's how we're going to respond to it. I mean, I'm just, I'm worried about the world in which, maybe this is, I set it up for you. Whenever we write opinions like this, we have to worry about a world in which we create perverse incentives, you know, where the agency, if it listens to comments and changes something, gets charged with that. We hadn't thought about that. You changed something. The whole point of notice and comment is for the agency to learn and to respond to and react to, and maybe incorporate some really well-made suggestions. And so, was it out of the realm? Would people not have thought to talk about hull thickness? And your own comments mentioned hull thickness. Of course, but no one suggested a new tank car design because they didn't realize it was within the realm of possibility. So, go back to the car analogy, right? We're presented with a car, you know, trying to fit 12 people in. Instead of, we're not given a minivan, we're given a completely new car that no one's ever been imagined before. So, how can people comment on that and actually have those thoughts thoughtfully considered? An increase in hull thickness is not something that hasn't happened before. That has happened before. It hasn't been in this particular format. Okay. But it's not like they were making up something new. Increasing hull thickness is a standardized way of increasing safety and reducing puncture risk. They said, okay, we will add that in. NTSB said you should give that. Okay, we will add that in. We'll call it, we'll give it a new number now, because it's different than the ones that don't have the increased thickness. But they weren't coming up with something that hadn't already been used. It's super-tacked to reduce puncture risk. In this context of certainly the double-hull of the DOT-113 tank car, it was new. It had not been done before. And it has. We're going to have, okay, we're going to have two, here's two protections that already exist out there. Increased hull thickness and the double car. That existed and increased hull thickness existed. They said, fine, we're going to do both. Belt and suspenders. That's not out of the realm of conception for someone to suggest, for people to comment on. But they didn't suggest to comment on it. Let me ask you a hypothetical. I'm sorry, for commenters to respond to. Along these lines, what if the agency had said, we're going to go to a triple layer? Would that be a logical outgrowth? Because they've already done a double outgrowth. I don't believe it would be. I don't believe it would be a logical outgrowth. Because any change in the physical tank car itself, we believe would not be a logical outgrowth, given what they proposed. Any change? Any change. Based on what they said in the NPRM, how they were going to consider operational controls and that people should therefore comment on it. I'm trying to get at some point, even if it's along the same lines of what we've done before. If it's something so novel, does it cease to become a logical outgrowth? What if they said, we're going to have half an inch thickness on the wall, on the outer shell? Is that a logical outgrowth? That's never been done before. Nobody's ever imagined that happening. What if they said, we're going to have a one inch wall? What if we're going to have four layers instead of two? At some point, is it not a logical outgrowth, even if it's loosely based on something we've done before? Right. And especially if they invited comment on saying, we are going to consider modifications to the tank car. Let us know what you think should be considered. We wouldn't be having this discussion about logical outgrowth. In the proposed regulatory impact assessment, they- What is your test in response to Judge Pan's question? Let me tell you what I want the test for. What is your test for when a change in a proposal is so materially different as to violate the logical outgrowth? I heard you say a couple minutes ago, any change. Is that your position? Well, no, it's when it's a change that commenters couldn't have defined that the agency would contemplate. Couldn't have defined because you know what? There were lots of comments in here about increasing hole thickness. So lots of commenters could define that was something they wanted to suggest, including your own clients. So let me try this again. So if we don't have that, so like it's not the flying car, it's completely at people's conception. What is a legal test that we could write an opinion ruling for you that would say, here's how we know that this was too novel, too far out of the realm of engineering capacities or common understandings of engineering options for tank car design to be on the table for anyone to know to comment about? What is the test? When you do an NPRM that says this is the existing design we're relying on and we are rejecting an alternative design, but we are going to invite comment on operational controls and consider them. And this is a deregulatory action that with no additional cost, however, we will consider operational controls. So please comment on that and end those costs. In the NPRM, PHMSA and FRA must consider requirements for both the packaging, i.e. rail tank car and operational controls. That didn't put anybody on notice that they were considering both the tank car design and operational controls. That's not sufficient? No, especially when they specifically reject another tank car design. Another one, but they gave a reason for that. They did. A different engineering reason. Yes. So why did your client and the other clients of the other two attorneys here submit comments about the tank cars? We challenged the adequacy of it and the safety history. I mean, this is a tank car that, you know, there's been 67 of them. Three of them were in a derailment. You challenged it and DOT responded by changing. Right, but they changed in a way that... That's not the end of your argument. If they change it in a way that commenters could have predicted, I think that is the end of the argument. Our argument is that commenters couldn't have predicted that they were going to come up with a new tank car design when they didn't put that on the table. Even though you commented about hole thickness. Regarding the existing tank car, because that's what they said they were relying on. If the hole wasn't thick enough. Among other things, yes. Okay, but okay, so you said this won't work, your hole's not thick enough, and we want to adopt a rule that says the agency can't say, good idea, good suggestion, we're going to increase it. That's the rule you want us to adopt? No. That's exactly what your position is. I think our position is that the agency invites comments on, and says we're open to having a new tank car, then we wouldn't be having this issue. So if they... We've been around the block on NEPA cases for decades, so if DOT did not respond to your comments, and the comments of the tribe, and the comments of the state, you'd be saying that NEPA, their assessment should be set aside because they didn't respond to  Well, there's a way to... It's a nice little trap you have there. I respectfully would disagree with that, that they can respond to comments and say we've considered what you said about the existing tank car design. You can't change anything. It seems to me that you had an opportunity to comment on thicknesses of the outer wall or the inner wall, but what you didn't have an opportunity to comment on is the adequacy of a nine-sixteenth inch outer wall. Correct, Your Honor, nor did we have the opportunity to comment on the weight of it. But that, to me, maybe it's not a logical outgrowth issue as much as an arbitrary and wall, which you could have commented on. You could comment on thickness, but they took the next step of saying, and this addresses all of the safety concerns that have been raised here, and nobody had an opportunity to comment on the adequacy of this new outer wall to address the safety concerns. Correct, Your Honor. There was never a look at what... That's not the argument you've made here, though. You've made a logical outgrowth argument. You made an arbitrary and capricious argument. We've done both. Yes, I mean, I think there's two sides of it. One is logical outgrowth. The other is arbitrary and capricious on the safety aspects. I mean, there's been no hint anywhere that these tank cars can survive a 50-mile-per-hour derailment. No hint anywhere? I mean, they did studies. And they all derailed, and they all breached. I mean... They didn't. And they're not about these tank cars. They're not about these tank cars, because these tank cars didn't exist. They're a new tank car design. So there couldn't be a study of how... Well, if ones that are just thick didn't puncture, then the additional thickness isn't going to increase the risk. Is there any argument that the additional thickness increases the risk of puncture? No, although I think there is an argument on the weight issue. I know, but they definitely dealt with the weight issue in their tests. But they did puncture. Everything punctured in all the tests, right? The best was a quarter.  I think... Correct me if I'm wrong. I thought the record was with the 916th inch, that was single wall. But still, there was a quarter of them were punctured. Yes, 8 out of 32 punctured. And that was at 42 miles per hour in a flat field. And remember, it's... There's nothing in the record of something not puncturing at 916th of an inch. Correct, at 50 miles per hour. And it's almost... 42 to 50 miles per hour is almost 20% faster. And because energy is the square of speed, you're talking about almost 45% increase in energy if you're talking about 50 miles per hour. Which only applies if there's... As a voluntary speed limit, there's 20 or more LNG tank cars in a row, or 35 or more throughout the consist. So, I had a question about this, because it just seemed to me, and correct me if I'm wrong, that this seems to be sort of an unprecedented amount of hazardous material that is being contemplated to be moved by rail. Because like the Esalino was two or three cars. Here, there's like a permit for something like 80 cars. And then there's, I guess, a statement in your brief that 22 cars would be like a Hiroshima bomb if it ignited. So, is it... My perception is there hasn't been anything like this before, where we're talking about 80 cars of liquid LNG, I guess four Hiroshima bombs almost, being transported together. And then the risk of derailment, you can't say that that's speculative or remote, because derailments happen. Absolutely correct on all scores, Your Honor. That's absolutely right. This hasn't been done. Ethylene is the closest comparable cryogenic fossil fuel that's been transported. There's years with no weighable data. It doesn't... It's one to three tank cars at a time. The entire existing fleet of DOT-113 tank cars, which encompasses of the C-120Ws, which transport things other than ethylene too, was 67 at the time of the rulemaking. And there's no limit on the number of cars you can string together?  That just seems extraordinary. It is, and could have catastrophic consequences if there is a derailment and there is breach. And certainly at the speed we're talking about, there would be breach and possibly catastrophic consequences as a result. Are you supposed to be doing the arbitrary and capricious argument too? Or I can't remember the breakdown. On the HMCA and APA, yes, I'm also doing that. Although, I mean, the states joined in that. I'm sure they will also have things to say on that argument as well. Thank you very much. Thank you, Your Honor. Is everybody planning to do rebuttal? I don't believe the states are planning to do rebuttal. Okay, so you and the tribe will do rebuttal. Yes. Thank you. Thank you. Thank you. Good morning, Your Honors. May it please the court. Brian Lusignan with the New York State Office of the Attorney General, representing 14 states and the District of Columbia. I plan to focus my argument on why PIMSA's analysis of the safety risks posed by transporting LMG by rail violated NEPA, although I think these issues are also relevant to the HMCA violations. First, PIMSA was required to prepare an environmental impact statement because transporting LMG by rail presents unique safety risks that are highly uncertain, highly controversial, and potentially catastrophic. And second, the environmental assessment PIMSA did prepare is arbitrary and capricious because the agency failed to grapple with a central safety issue of what will happen to 50 to 100 tank cars filled with LMG in derailment conditions. When PIMSA suspended the rule, it candidly acknowledged the many uncertainties underlying the rule but failed to take the logical next step of repealing the rule in full. This court should vacate the rule so that it does not spring back into effect in July of 2025 and so PIMSA can write a blank slate when it proposes a replacement regulation. With respect to the requirement for an environmental impact statement, this rule poses unique safety risks that are highly uncertain and highly controversial and implicate at least three of the intensity factors that require an EIS. Implicating any one of these factors, it may be sufficient... Where do these factors come from? The Council for Environmental Quality has regulations defining when... Where does the Council on Environmental Quality get the authority to issue binding regulations? I'm not sure the answer to that question, Your Honor. These are the regulations... We know that there's at least four opinions of our court, maybe more, that question whether CEQ has any regulatory authority because the statute, the NEPA statute doesn't give it to them. It was Jimmy Carter in an executive order that did it, and the question is whether that violates the separation of powers. Your Honor, are you familiar with those cases? I'm not familiar with those cases, Your Honor. I apologize. I do know this court in the Standing Rock Sioux Tribe... Does the argument depend on the CEQ regulations? No, Your Honor. You can go back to the statute if you want. It requires an environmental... Factors? There's not 10 factors in the statute, is there? The NEPA requires an environmental impact statement for major federal actions that may have a significant environmental impact. That's significantly, right? Significantly, and the CEQ regulations define significantly. Even if you just want to look at the statute, I think transporting LNG in these tank cars, 50 to 100 together, poses a significant risk of danger. PIMSA itself has acknowledged many times the dangers posed by transporting LNG by rail. In the rule, it recognized that release and ignition of an LNG vapor cloud poses a, quote, serious threat, end quote, to people nearby. So, this could be framed as violating the statute and the case law that says the agency has to take a hard look at the problem. Correct, Your Honor. So, we could just not rely on the CEQ regulations and decide it based on the statute and the case law, if need be? That's correct, Your Honor, and can look at both the significance of a release event, an event where there's a derailment and LNG is released into the environment, and the fact that the possibility of that is not remote and speculative. PIMSA concedes that you cannot eliminate entirely the risk of derailment. What is a hard look? A hard look requires that the agency recognize, acknowledge the environmental impacts that its actions will have and fully evaluate them. A quick glance, is that what it is? It's more than a quick glance. It's looking at the problem and explaining whether that problem is significant or not significant. That's what you do with the environmental assessment. That's what's done in every NEPA case, yeah. Well, not in every NEPA case, because typically for a major nationwide regulation like this, the agency would do a full environmental impact statement. Here, PIMSA didn't even do that. They just did an environmental assessment, which is what the agency is supposed to do to determine whether an EIS is required. Doesn't our case law say something similar to what the CEQ regulations require? Because it does say, I'm looking at Myersville Citizens versus FERC. It has to show that if there's an impact of true significance, an EIS is unnecessary because changes or safeguards in the project significantly reduce the impact to a minimum. That sounds very similar to, if there's a grave risk, it has to be remote or speculative. It's similar, although not exactly the same. I guess the bottom line of your argument is, this is a potentially catastrophic event with dire doomsday consequences. They didn't adequately justify that it's not significant because it's just so unlikely to happen that we don't need an EIS? That's correct, Your Honor. I think another relevant case from this court is the New York v. NRC case, where the court said that NRC couldn't just ignore the possibility that spent nuclear waste will remain on site indefinitely based on its conclusory statement that there'll be a permanent solution when necessary. Has DOT disputed the applicability of the CEQ regulatory significance factors in this case, or did they accept them? DOT has accepted the use of the CEQ regulations in this case. No parties argued that they wouldn't. They didn't raise any argument about it. That's correct, Your Honor. Under the regulations, they're not allowed to paraphrase or repeat CEQ regulations. All they can do is supplement them for the purpose of the particular agency involved. And the CEQ regulations say that, do not paraphrase, do not repeat. That may well be, Your Honor. It's not may well. That is true. Okay. Very well then, Your Honor. I accept that. And again, I don't think you need to go to those CEQ regulations if Your Honors have concerns with them. I think the statute itself and this court's precedence interpreting the statute required an EIS. Yeah. By the way, DOT never published any regulations dealing with NEPA. The only thing it did was, I think, in 1979, issued an order, but it's never been published in the Code of Federal Regulations. Well, unquestionably, DOT remains subject to the NEPA statute, which requires an environmental impact statement for major federal actions that may have a significant impact on the environment. And this is also a case where a wide range of commenters with specific expertise and knowledge about safety issues urged PIMSA to do more analysis of the safety risks posed by transporting LNG by rail. These commenters included the National Transportation Safety Board, various state safety agencies, organizations representing first responders, the Puyallup Tribe, all urged PIMSA to wait until the crashworthiness of these tank cars could be fully evaluated before finalizing the rule. What is the harm that your clients allege? For standing purposes? Yes, Your Honor. We've alleged three forms of harm for standing purposes. Probably the easiest to discuss is the proprietary injury to our financial resources as we have to prepare for the transportation of LNG by rail through our states. There was a special permit issued to a transporter specifically to transport LNG from Pennsylvania to New Jersey. Both of those states are in our coalition. There's also the record is replete with references to the need to transport natural gas from Pennsylvania and other Midwestern states to New England. All the overland routes for that would pass through New York. One of the requirements is that the harm be imminent, right? Correct, Your Honor. And there was the government comes back and says, number one, this regulation is not going into effect until next June. If it ever goes into effect, it might be suspended or replaced. And number two, it would take five years to build up a fleet of tank cars sufficient to transport the LNG. So if you add that together, it's like, you know, about five and three quarters years before anything gets rolled down the tracks. Why is that imminent harm? Your Honor, I would disagree with that timeline. The suspension rule will expire on its own terms in July 2025 unless PIMSA issues a replacement. Excuse me, unless PIMSA finalizes a replacement rule. PIMSA has not yet even proposed a replacement rule. So it's almost certain to expire in July of 2025. Additionally, PIMSA acknowledges that these W9 tank cars are currently being built, albeit they're being built to transport ethylene. But if you read our declaration from Jim Cable, our standing declaration, those tank cars can be converted to transport LNG in a matter of months. So if this rule... They can be converted, but then you need the equipment that does the freezing, right? You would need a liquefaction facility. I'm not familiar with the technicalities of how those are constructed, but PIMSA recognizes there's at least one of them currently capable of loading LNG into tank cars. Are there already permits? I thought one was... Oh, yeah, yeah. Yes, there was a special permit issued for... Oh, so there are a couple of different permits related here. There was a special permit to transport LNG in these 113C, 120W tank cars issued to a company transporting it from Pennsylvania to New Jersey. There are also two permits for transport of LNG in these portable tanks that you can put on a flatbed rail car, one in Alaska and one in Florida. So that's a slightly different issue. But that assumes liquefaction can occur. Right, exactly. They are capable of filling these tanks with LNG at this point. I see that I'm out of time. Unless your honors have further questions, I rest on our briefs for the remaining issues. Thank you. Good morning, your honors. Aaron Rensher for the Puyallup Tribe of Indians. The Puyallup Tribe became involved in this litigation for the main reason being that it only has one reservation, and it's not going to be getting another one. Protecting its homeland is of paramount importance to the tribe, and the tribe has grave concerns about the implications of this rule. The tribe notified the agency about those concerns, and the agency treated those concerns like a check-the-box exercise. Could you address the tribe's standing? Because it seems to me, and correct me if I'm wrong, that you're relying on the theory that LNG will be transported by rail from the Tacoma LNG facility, but it doesn't seem like there are any plans to do that. It doesn't seem to be any connecting the rail spur there to a railroad track. So, first of all, I would say that we're not relying on that in terms of standing. I think that that is obviously significant for the disparate impact analysis that we raised in our briefing, but in terms of standing, this rule does not have any restrictions on where these trains, with their unlimited numbers of cars full of LNG, can go. I'm sorry. Don't they have to go near the tribe's land in order for the tribe to have standing? Otherwise, they're not affected. Yeah, and nothing in this rule would prevent these trains from going through there. I think it's through the tribe's land. Nothing in the rule restricts where the trains can go. Now, I understand the risk of them going through the land is much greater if it's being transported from Tacoma LNG. There's certainly evidence. But then anybody would have standing that's near a railroad track in that theory, right? Right. If your theory is nothing would stop a train from using railroad tracks near us, then every party or entity that's near a railroad track would have standing. That can't be right, can it? I think it could be, because if the standard is, well, you have to show that this harm and I know Judge Randolph used the word imminent, but I think that word has to be relative. There's no time limit or restriction on this rule. The AAR, when it requested this rule, specifically said this rule is likely to, if approved, is likely to increase the interest in transportation of LNG by rail. That wasn't my, imminent's not my word. No, I understand. Every recitation of what standing requires for the last 40 years is. I certainly agree, but I'm just saying that we need to understand what the word imminent means because we have a 30 day deadline, or maybe it was 60 days to file a challenge to this rule. And if the standard is, if the definition of imminent is, it's going to take several years to get these fleets prepared and going, and therefore it's not imminent, then nobody has standing to challenge the rule within 60 days. I don't know if you dealt with that problem recently. If you're not affected at the time, but you're affected later, you can challenge later. And also my issue is the geographic nexus. I think there has to be some geographic nexus for this type of harm, doesn't there? Yeah, I mean, right. And so, I mean, we have the Tacoma LNG, if we want to talk about the Tacoma LNG facility, certainly we put evidence in the record that the owners of the Tacoma LNG facility have promoted their access to the rail lines, the rail spur that is at the site as a competitive advantage, which clearly says this is an anticipated end use of this facility. The LNG facility near the Tribal's reservation boundaries, there is one, is it? Yeah, it is on the reservation boundary. Is it operational? It is an operational. And so it's used for trucking. It does. I believe it ships. Not ships. Its primary use is to fuel ships, Your Honor, but it also- From trucks. No, no, no. It's served by a pipeline that goes from the facility to the dock. It's at the port. It's in the port of Tacoma. Now, you also have a consultation claim. We do, indeed, have a consultation claim. You assert statutory and regulatory and second quarter rights to consultation. Right. The procedure of injury. And you're saying it didn't happen. That's the issue in the case. But that is a distinct injury as well? Well, yes, I would agree that it's similar to the Eagle County case that this court cited in terms of the harms, potential harms to the tribe, the risk of derailments and safety risks that this court found sufficient to support standing in that case, and the procedural harm being the failure to consult with the tribe about this, as well as the failure to conduct a proper environmental justice analysis, which is also a procedural harm. The consultation claim, the National Historic Preservation Act requires the agency to impose an affirmative obligation on all federal agencies to consult with any Indian tribe that attaches cultural or religious significance to property that may be affected by a federal undertaking. PHMSA has not disputed that. I have not looked at that statute in years. I know at one point it was considered not judicially enforceable. Is it? I'm not aware of that. We've had cases, you know, including from this court as recently, I think United Quito was in 2019 that applied that. Okay. Section 106 of the NHPA. In any event, PHMSA has not disputed that the rule at issue was a federal undertaking, and PHMSA did not comply with its obligation. How did this repeated outreach to the tribe, emails, phone calls, emails, phone calls? What is your best case for that that was not sufficient effort to consult? Well, I mean, the question is whether a handful of emails and phone calls over a period of a few weeks, what's our case for that being incessant? The best case is that it's not sufficient outreach to the tribe. Every single consultation case cited by any of the parties, whether it held consultation adequate or inadequate, involved much, much more. That doesn't answer my question as to what is the baseline that the statute requires. There may be others where there were more activities, but here they had the meeting, and I understand your explanation that meeting was cut short. But then after that, there were repeated emails, many unanswered by the tribe, phone calls, efforts to schedule meetings. Okay. I don't know what is the legal rule that says that's not sufficient efforts to consult. So, first of all, about the meeting, I'll just say it's just our position that it was cut short. It's PHMSA's position that it was focused on other topics. I'm trying to skip over for sake of time here because you wanted to save some time for rebuttal. So, I'm trying to save you some time here. From the regulations and the case law, our view is that there are four characteristics of a meaningful consultation. Those characteristics would be a robust exchange of information and views. They can't do it if you're not answering the emails or the phone calls. They were trying to schedule it. You can't complain about the lack of robust exchange if you didn't respond to their efforts to schedule a meeting. Right, but the meeting they were trying to schedule was not consultation, that what they were trying to schedule was a meeting on very short notice with an agent or a lawyer. I mean, the shelter said there wasn't a whole lot of time left, and the tribe didn't. In their NBRM, they said, we don't think this implicates a need for tribal consultation. That's public. Tribes were on notice if they disagreed to weigh in sooner, but they provided notice to tribes that they didn't think consultation was required, and it wasn't until very late in the game that the tribe said, we think consultation is required, at least for us, given our situation. Okay, so let's start with the timing aspect of it, because the NHPA regulations specifically say that tribal consultation needs to occur early in the planning process. They said early on, they gave notice early on that they weren't aware of a need for it. They can't do tribal consultation if they've made a determination that they aren't aware of a need for it. That was public notice. They also can't throw out their statutory obligation to consult by simply saying, we don't think there's a need for us to comply with no analysis of the rule. How do they know they knew? How would they have known otherwise? Well, you know, I mean, I think— It can't be every single thing every agency does. They're going to have to call every single Indian tribe in this country and say, would you like to consult? Well, I don't know that they need to call. This could certainly send a form letter, you know, if that's the concern. I'm not aware of any case law that says the NPRM itself, Public Notice Federal Register, isn't sufficient. I mean, there's a case law saying that not beginning consultation until after the notice of proposed rulemaking is insufficient. If you know that it's going to have implications. I'm dealing with a situation where the agency had come to the recent conclusion that it wasn't going to have implications, and maybe they weren't aware of the particular geography of your tribe. So I get the court's point. And so the question is, OK, they're sending these emails. All right. Every single case that has addressed this issue has involved consultation that took years, not a few weeks. All those cases involved formal letters from the agencies to the tribe initiating consultation. This time they did it in email. I don't know how I write an opinion that says repeated emails that are not answered by the tribe are insufficient. Well, I mean, repeated emails offering something that is not sufficient consultation would certainly be insufficient. Their office case that meeting with the general counsel is not sufficient consultation. Well, I mean, I'm trying to get a framework here. I understand the facts of what you're arguing. I'm trying to get a legal framework that says that their efforts repeatedly to have you meet the general counsel as part of the leadership were as a matter of law and sufficient consultation. Well, I mean, there's a case. There's also the Keachon tribe case from the Southern District of California held that the main thing was wrong there. In two and a half years of meetings and letters, Keachon tribe. OK. So the fact that there was a case where there's two and a half years of meeting doesn't answer my question. Which said, the main thing that that case said was the error was the failure to offer the field managers in charge of the case, in charge of the project as a consulting party. OK. Right. So, but I mean, in that case, there were people that were authored who were part of the leadership. It wasn't the decision makers. Here, the issue is our position is for government to government consultations to be meaningful, that it's inherent in that concept that it's with the decision maker. Is there any? OK. Is there any precedent from our court defining decision maker as you would have it? I don't know who you want. I don't even know who you think that decision maker should be. We're supposed to. Who are you supposed to meet with? The head of PIMSA? Well, I think it would be up to PIMSA to identify who that person was. Identify the general counsel. No, I don't think that no, they never, ever claimed that that was somebody with decision making authority. They said that they was part of it. They said it was the agency lawyer. Well, you don't have you don't have any idea who you wanted to meet with either. I think the head of PIMSA would be appropriate. But certainly, if PIMSA thought that there was somebody. And what is the best case that it has to be the head of the agency? So again, I, you know. The Southern District of California? Yeah, yes. I recognize it's a case from the Southern District. We don't have a case from this court. We do have cases from this court saying that there is very little precedent about what meaningful consultation is. But one more sentence. I know you want to save some time for rebuttal. And you're already over. So go ahead and finish that thought. Right. So the point I want to make is we do have authority from this case, from this court acknowledging that once the substantive decision has been made, that is too late for meaningful consultation to occur. And in the email exchanges that we're talking about, the agency admits they are already working to finalize the final. I understand. But we have precedent from this court that says it's not over until the fat lady signs on the federal register. No, it doesn't say that. It says that would be incorrect because the court is talking about the Eighth Circuit case of Oglala Sioux, where it was not a final order issued. When it said that the substantive decision had been made, the order, the final order was issued after the consultation occurred. So if there were precedent from this court saying as long as it happens before the final rule, then that would bind this panel. I would assume that this part would be required to follow other students. Yes, sir. Okay. Thank you. Any other questions? Thank you. All right. Let's hear from Tim. May it please the court, Rebecca Jaffe, appearing on behalf of the United States. With me at council table are Charlie Enloe and Sean Ford from the Department of Transportation. In promulgating the rule, PHMSA acted reasonably under the APA's Arbitrary and Capricious Standard and applied its expertise in hazardous materials transportation. The rule rested on top of the existing hazardous materials regulations, a rule that was passed of regulations governing all aspects of hazardous materials transportation. And then for LNG specifically, PHMSA added a number of requirements, an enhanced outer tank, enhanced braking systems, remote location and pressure monitoring, safety and security route planning, among other things. PHMSA reasonably concluded that these additional requirements, plus the existing hazardous materials regulations, would ensure the safe transportation of LNG by rail and prevent any significant impacts. How does PHMSA know that this is sufficient? Because it just seems that this is sort of an unprecedented amount of hazardous material with exceptional inflammatory properties. It's just the doomsday scenarios are quite dire when we're talking about LNG that can result in a boiling liquid expanding vapor explosion that can leak and then ignite. And there's no limit on the number of railcars you can string together full of LNG. There's, I guess, they've made the argument that 22 railcars is the equivalent of a Hiroshima bomb. I just find this extraordinary, the risk being so high, and that you think just increasing the thickness of the outer wall would be sufficient to address that risk. How do you know that? And what's your basis for saying so? A couple of points, Your Honor. First of all, the hazardous materials regulations, PHMSA in its history, has never limited the quantity of hazardous materials that can be transported in a particular train. And there are other flammable hazardous- There's a permit that asks to string, I guess, 80 of these together. It's actual, it's a lot of trains. That's almost for a Hiroshima bomb. Your Honor, I can't speak to the accuracy of the Hiroshima bomb analogy, but I can say that PHMSA in 2015, for example, promulgated a rule addressing what it calls high hazardous flammable trains. So that's large shipments of crude oil and ethanol. Those shipments often have 70, 80, 100, 100 plus cars in the train. PHMSA has never limited the quantity of hazardous materials that can be on a particular train. No, I understand. I just think this seems to be unprecedented in what the doomsday scenario would be. Because derailments are not remote or speculative. And it just seems that there's this risk of cascading consequences. If you've got a whole bunch of these together and one ignites, and they all ignite, and say it's near a city or a populous region, it just seems extraordinarily dangerous. Your Honor, I beg to differ. PHMSA put a number of safety measures into the rule. There's the enhanced thickness of the outer tank. No, I understand that. I'm just wondering why that's adequate. And why is it not arbitrary and capricious that you decided that was adequate when there's been no testing? To the first point, I would just say that's not the only measure in the rule. But to the second point, PHMSA relies- The other measures are even less convincing. But go ahead. I think it's the measures combined together that were the basis for PHMSA's determination. But PHMSA did rely on modeling done for that 2015 regulation that I mentioned that showed the risks of breaches and punctures were much lower with 9 sixteenths of an inch thick tank shells. It also looked at real world derailment data that showed comparing three derailments where two of the derailments involved cars that are 7 sixteenths of an inch thick, and then one derailment had cars that were 9 sixteenths of an inch thick. Those cars did much better in the derailment. It's lower, but it's still, I guess, these particular types of cars that you're proposing have never been tested. And there are no studies where there was no puncture. It just seems potentially catastrophic. And I guess to put this into the legal framework, you're required to do an environmental impact statement if there's a significant risk. And this is a huge risk, and it's not remote or speculative or unlikely to a minimum. You haven't proposed things that make it to a minimum. So whether you look at the CEQ regulations or whether you look at the case law, why is this not something that requires an environmental impact statement? Because of the significance and the graveness of the danger involved. I beg to differ, Your Honor. The agency did propose or require a number of measures to minimize the risks. It also relied on its lengthy history of hazardous materials, transportation regulations. But derailment is a risk, and you can't do anything to, I guess, it's not within your ability to make railroads more safe. But given that derailment is a risk that's not remote or speculative, and the catastrophic consequences of the derailment in this scenario, why is not an environmental impact statement required? Well, Your Honor, a couple of points. First, I think that's part of why, for example, among the measures that PHMSA required in the rule, it required safety and security route planning to make sure that railroads are taking into account various factors such as population density, track profile, sensitive areas nearby. So railroads are required to do that, and they do do that. They also, PHMSA also required enhanced braking systems for once there's a certain number of LNG cars in the train. And some uncertainty doesn't mean that an EIS is required. And here- But it has to be remote or speculative, or it has to be reduced to almost a minimum. Like, you just, in your brief, it seems your position is the risks have been lowered, but it hasn't been lowered to the extent that the case law and the regulations, if we rely on them, require. I disagree, Your Honor. I think PHMSA took a hard look here, and it reasonably concluded, based on its expertise in hazardous materials transportation, based on studying past derailments and what happened in those derailments, based on studying 450 incident reports involving releases from DOT 113 cars specifically, based on the measures that it put in this rule- So the safeguards have to sufficiently reduce the impact to a minimum. You think the risk of a derailment is at a minimum based on what the agency has done? I think the risk of significant impacts from a derailment has been reduced to a minimum. Yes, Your Honor. Explain that. Because PHMSA required the nine-sixteenths of an inch outer shell, which the modeling and data show, and the real-life derailment analysis show, has a reduced risk of punctures. Also, the DOT- If one car gets punctured, is that a significant impact? Your Honor, it very much depends on the context, but- I'm asking this because you said we have to reduce significant risk of significant impact from a derailment. You can't stop a derailment if you- So then you start talking about punctures. I'm trying to figure out if one LNG car is punctured, does that count as significant impact, or do you think there have to be multiple punctures? I think it would very much depend on the circumstances, which is- What other circumstances? Where did the derailment happen? Did the pressure relief devices function as they do in the testing? How quickly did first responders respond? PHMSA also does a lot to make sure first responders know how to handle incidents involving hazardous material. And that's why it required safety and security route planning, so that if any derailments occur, railroads will have considered the potential risks of any given location that they might be transporting. I guess I'm trying to interrupt your question here, but I'm trying to understand how you could decide it's no significant impact, or it's the minimum possible significant impact from a derailment when you can't- I take it there's no rail path for this LNG that avoids populations altogether, it avoids people altogether, or sensitive environments altogether. All right, there's going to be people along here. We don't know where the derailment's going to happen. If they're avoiding large populous areas, understandable, then they're in rural areas. You can't make every volunteer fire department in every town of 1,000 people be ready to respond to a punctured LNG car, or two, or three, or five, or a hundred of them. I don't understand the analysis, and maybe just elaborating, or giving my own concerns following up on Judge Pam's question. Just telling me a few technical things that are there doesn't tell me the reality of how this is going to work on the ground. If a derailment were to occur- In a rural area, so it's not a city. It may not even have a professional firefighting department. Part of the hazardous materials regulations are requirements for hazard communication. Every car carrying hazardous materials has placards denoting what's in it. Railroads also have to have lists of the contents of every car. I don't think there's any help at all when the derailment occurs in a populous area that has a volunteer fire department. Because the book will say, this evacuation distance. For example, for LNG, it's a mile, which is a distance that CIMS uses for a number of substances. It says, don't shoot water on it. Use this type of foam. Does every volunteer fire department in every rural area in the country have foam? That I don't know, Your Honor, but I do know that CIMS issues grants to help first responders build up their capabilities. But the key thing is containing the scene until the railroads have experts that come in. And I should acknowledge- Are they on the train already? Or how fast do they come in? I don't know where they're based. I don't know either, Your Honor, but they- All this stuff seems like stuff we need to know if you're going to say there's no significant impact from a derailment, or there's a car punctured, or two, or three. Your Honor, I think CIMS looked- I grew up in a small town, so I'm trying to figure out how they're supposed to respond to this in a timely manner. You don't have days before the harm happens here. You've got, what, maybe minutes or hours? Well, that's partly why CIMS required such a robust tanked car here, because that buys time. It reduces the number of punctures. The DOT-113 cars also have redundant pressure relief systems. The pressure relief devices are on either side of the car. So even if there is a fire, CIMS expects that the pressure relief devices will function and any dangerous pressures will be vented. So- Are there two different risks here? The pressure release is- Because if the LNG starts- They call it boiling, but it starts- It goes above the negative 260. It starts to become vapor, and it builds up pressure, and it can explode the car. But the puncture is- It comes out, and that- It could be ignited, right? Isn't that the risk? And it can do this, like, vapor cloud, and all kinds of things can happen once it gets out, and there's a puncture. And if it's ignited, and there's a car of 22 of these, do the other ones ignite as well? I'm just trying to understand. There's a couple different kinds of risks here, and it's just not at all clear to me that the agency has done the work of testing the different scenarios that could occur. Does pressure relief deal with the leaks? So- Sorry, I'm just basing the question on you. Yeah, no. A couple points, Your Honor, and I apologize for being unclear. A pressure relief device is not what's going to prevent a release of hazardous material. I do want to clarify, there's different terminology here. Just because there's a puncture doesn't mean there's a release of hazardous material. You can have a puncture, for example, of the outer shell. That doesn't mean the inner shell got punctured. But going with your hypothetical, assume there is a breach, and there's a release of LNG, and it does catch on fire, which is three ifs all together right there. But it doesn't seem very remote in a derailment. Your Honor, PHMSA evaluated the risks here. No, I understand. I just think derailments happen. Sometimes they're quite severe. You have, I mean, it's clear that it happens, and sometimes the trains are wrecked. And so what happens if there's 80 LNG railcars in a row, and one of them, say, pressure release doesn't work, and it explodes? I guess it says that happens. You've got a fireball. You've got projectiles. You've got all kinds of stuff. Does the entire train blow? So PHMSA concluded that the pressure relief devices would work, because there's redundancy. Even if one doesn't work, the other one would. Then let's say there's a fire, going with your example. Then the other cars, let's say another car heats up. Then its pressure relief devices will work. And again, we have the robust outer tanks. And these are the 113 cars. The tanks are breached. I just want to make sure I understand this engineering question. They're breached. The inner tank is breached. Pressure release is no help, because you've got a hole in the stuff coming out. Yes, Your Honor. If the inner tank is breached, we've got to assume the outer tank is breached. Yes, Your Honor, and that is true. If the inner tank is breached, the outer is equal. I'm sorry. I'm trying to respond to the question of, if one car breaches, how would that affect other unbreached cars? And for those cars, if they're exposed to fire, then they would vent. What are they venting? Are they releasing LNG into the air, or what are they venting? Yes, they would be venting LNG vapor. I think I read someplace that if they turn upside down, the vent system doesn't work. SAMHSA, I believe at JA459, there's a footnote that says even if they're upside down, the way the pipes work, they'll still vent. But can you – did SAMHSA determine with 100 percent certainty that the pressure release systems always work in a derailment? I'm not aware that it reached 100 percent certainty, no, Your Honor. But it did examine every incident report it had for a DOT-113 car ever since those have been in operation, and that's over 50 years, 100,000 trips transporting hazardous material in the 113 cars. The NTSB said that what you did was not adequate. The NTSB recommended that SAMHSA adopt certain operational controls, and it did follow the NTSB's recommendations. I mean, in rulemaking, the agency's not necessarily going to – It's more than that, though, so that it was not an effective safety evaluation. Your Honor, there's a range of comments that come in on any given rulemaking, and SAMHSA responded to the NTSB's comments, and the NTSB made some suggestions that SAMHSA thought were reasonable, and it adopted them. Is there any risk from the vented LNG vapor? Is there any risk if you had, say, 80 cars with LNG on the train, and they all had to start venting? Is there any risk from that? Or is it only if it's actually – I suppose there could be risk. It could be – the SAMHSA's emergency response guidebook that it publishes that gives information about how to deal with each hazardous material does describe, you know, if there's vapor – you need certain personal protective equipment. So, I can't say that venting LNG is reducing the risk to zero, but I – But the pressure release system itself creates a hazard. For people in the area, and you're going to have 80 or 100 of these cars, and let's assume any, you know, 20 or 30 of them, because of the derailment, are all venting at the same time, does that create its own safety hazard? So, LNG will – excuse me. I'm sorry, would you mind saying that? If you have multiple cars, the large numbers that are authorized here, venting at the same time and in the same area, does that create its own health issue? No, Your Honor. But the environmental assessment said that venting LNG can catch fire. There was an incident in the environmental assessment. Yes, it can. It can. What I'm saying to the health issue is in the air, LNG will eventually dissipate. And so – and part of PHMSA – Eventually, but – And PHMSA in the guidebook recommends a one-mile evacuation distance for LNG. So, to – The venting starts right away from the derailment. If the pressure goes up, it's going to start pretty fast. I mean, it would depend on the – It must take some time to evacuate a community a mile away. I mean, how quickly the venting would start, I think, would depend on the circumstances of the derailment, and the time it would take to do an evacuation would also depend, I think, Your Honor. On the prior transportation of things, I guess ethylene is the one that the agency thought was most similar. Is my understanding correct that there isn't a history of having 10, even 10, let alone 100 ethylene cars in a single train? It was only a couple at a time? That is correct for ethylene, which is similar as a cryogenic flammable liquid to LNG, but PHMSA also has experience with high-hazard flammable trains like crude oil and ethanol, and those are transported in quantities of 80, 100, or more. So, this was the comment from the NTSB. Because unit trains of DOT-113 tankers carrying large volumes of flammable cryogenic gases have no operational or accident performance safety history, we believe a thorough safety assessment of the tank car specification is needed. There's no history of doing what this rule allows. There's no history of unit trains, which are trains carrying all of one thing, large numbers with DOT-113 cars. But PHMSA looked at a number of sources for its conclusions in this rule. It looked at the history of 113 cars, which is what you need for a cryogenic liquid. It also looked at the history of unit train transportation of flammable liquids like crude oil and ethanol. Totally different. You have a derailment with crude oil. It's very different from a derailment with LNG. There certainly are differences, Your Honor, but I think that's where PHMSA's expertise really comes in to say, here's what makes sense to... On your expertise, I want to throw one more mix into the factor here. No speed limit. No speed limit. I mean, you talk about there's a voluntary standard by the American Association of Railroads, American Railroad Association, is every railroad that's going to transport LNG required to be a member of that association? That I don't know, Your Honor. But I do know that... That's not the rule. The rule requires you to be a member. Maybe every train is already a member? I don't know. My understanding is that PHMSA, that all railroads have incorporated the industry guidance, industry requirements for best practices into their operating rules, and PHMSA and the Federal Railroad Administration are not aware of railroads not complying with it. I'd like to ask you a question on a somewhat different topic. Two years ago, no, a year ago, was it 22 or 23, you filed a document in this court opposing lifting of the abeyance that the court had issued. You remember that? Yes, Your Honor. And you made representations in that document about the ongoing activities of this particular administration aimed at amending the rule that we're now arguing about. Yes, Your Honor. And you also said that imminently, or soon, that another abeyance regulation would be issued. Do you remember that? I'm not sure the adverb that I used, Your Honor, but... I just looked at it, trust me. But what is going on now with the... You say in your brief that there's all kinds of studies that have been done. There's a joint task force that's been put together. You said that the fact, whenever this was, let me get the date straight. This was a year ago in June. You said that the agency was contemplating two rulemakings. One is to amend the rule that we're talking about here. And the other was another suspension. So what has happened? What is going on now? The rule is currently suspended. PHMSA suspended the rule in September of 2023, and it's suspended through June of 2025. So before the suspension happened, nobody had transported LNG by rail under the rule. Now nobody can, because the rule is suspended through June 2025. PHMSA has also been doing a number of tests, and that it is planning to use to inform a subsequent rulemaking that would amend this rule, revise it in some way, or consider doing so. And in the spring 2024 Unified Regulatory Agenda, PHMSA said that it anticipated doing a notice of proposed rulemaking. Has something been submitted to OMB? No, Your Honor. So you anticipate doing an NPRM when? The spring 2024 Unified Regulatory Agenda said April 2025. Okay, so there's no way you're going to have a final rule by June 2025 when the suspension ends. That may be unlikely, Your Honor, although PHMSA could decide to extend the suspension. It hasn't made any final decisions in any direction on this. Do you know whether there's any further suspension regulation in the works? I don't think PHMSA is currently working on one, but it may choose to do so between now and June. Is this rule on a list that's submitted pursuant to the executive order that's submitted to ELIRA? When President Biden took office, Your Honor? Yeah, which required examination of every regulation that was issued during the Trump administration that affects the environment. Yes, Your Honor, this was. It was on the list. To be very precise, Your Honor, it wasn't named in the executive order, but it was on the White House list of rules that needed to be considered under the executive order. Is there any official agency pronouncement indicating that this rule needs to be amended? PHMSA has not reached any final conclusions, Your Honor, about whether it's going to amend the rule in some way or take some other action. Well, let me rephrase the question. Whether this rule is going to be amended or repealed? PHMSA has not reached any final conclusions on that, Your Honor. And the representations that we see from counsel that sort of hint at that are not approved by the administration? Not that Biden administration, the administration, the hazardous materials administration. Your Honor, PHMSA has reviewed every filing that we've submitted in court, and it has published in the Unified Regulatory Agenda anticipated timing for what we've been calling the amendment rule. The anticipated timing for the notice of proposed rulemaking for the amendment rule has shifted back several times. Has it shifted since that last pronouncement? So I'm asking these questions because I think there's a substantial question whether this case is right. And there's a Supreme Court case called EPA versus Brown that indicated when the attorney for EPA got up and argued before the Supreme Court and then said that the regulation in front of the court was going to be amended, had to be amended. The Supreme Court then vacated the lower court's decisions pending the outcome of that proceeding. And if we're not there with this rule, it seems to me, given the representations that have been made, we're awfully close. And there is a timing question, I agree, but we're going ahead and deciding the validity of a rule which may never go into effect practically. That may be true, Your Honor. I don't know when any final amendment rule would issue if PHMSA has not yet made any decision. Speaking for myself and having consulted with my colleagues here, I would like to see a representation in writing from you on behalf of that agency with respect to the timing of any possible new suspension regulation or a notice of proposed rulemaking. And if there is no such schedule, I'd like that to be stated in the filing too. Yes, Your Honor. Thank you. I will do that. I forget where we were. I'm just so concerned about the speed limit. If we don't know that all trains are members, or even if they are all members, all it requires is voluntary compliance and the rationale being that gives the industry flexibility to respond more quickly if new technology comes along. So there's no speed limit. There's no speed limit. It's like if they sit on the beltway here, 55, but it's voluntary. There's no enforced speed limit for these trains of 80 to 100 LNG cars. And I just didn't see that. The assumption that, well, we're trusting that everybody will comply seems to me, I don't think that's true. What are the prospects of somebody violating the 55 mile per hour rule? And to add to that, there was an accident at 42 miles per hour where there was puncture with nine 16th of an inch cars. Your Honor, SAMHSA and the Federal Railroad Administration, they are not aware of any instances of railroads not complying with their operating. Railroads have to comply when they violate the, it's not even a violation, it's voluntary. They have to report their speeds to the association or to FRA or SAMHSA or. I'm not aware that railroads have to report their speeds all the time. A lot of the speeds are programmed into the trains. A lot of trains have PTC, I think it's positive train control programmed in. And so they program it in. Out of trains, does that mean all trains that would carry LNG? I don't know, Your Honor. I think it's most trains on major tracks by major railroads, which have. Those ones that carry LNG, I don't know. This seems to me a big hole, a big problem. If there's actually no enforceable speed limit, and you say we don't know about violations. Well, I'm assuming people don't voluntarily report when they go over a speed limit, let alone a voluntary speed limit. But what's the report? It was voluntary. Well, railroads do have to comply with their operating rules. I should also note that railroads have their own speed limits related to the particular tracks and the track profile that they're in. Do any of those go over 55 miles per hour? To my knowledge, Your Honor, the fastest any freight train could go would be 70 miles per hour, but that would not be if it had 20 cars of hazardous material. Or one car. Even one car of hazardous material? If it had one car of spent nuclear fuel or poisonous by inhalation. I'm asking if it was one car of LNG or two. It would depend on the track location. They could go more than 55. It is possible, Your Honor. It would depend on the track location. And the railroad's security and safety route planning, their analysis of the track profile, all of those things. Cross your fingers and hope, rule. I beg to differ, Your Honor. Is there uncertainty as to what speed these trains are going to travel for purposes of whether an EIS is needed? And what the impact would be on the higher speed frequency and impact of higher speeds would be? Simza did not believe that there was any uncertainty. What basis? Can you tell me? You don't know if all trains are even part of this association, so those trains won't even be subject to this voluntary standard. We don't have any idea how many comply with this voluntary standard. We don't know how many have it programmed in speed control and what that speed control is, because apparently on some tracks, it could be 70 miles per hour. That seems like a lot of unknowns. It seems quite relevant to what... I assume the speed of trains is a factor in increasing the risk of derailment. Is that wrong as a matter of physics? I should not say the court is wrong. I haven't had physics in high school, so you could say I'm wrong, and I would have to defer. But, okay. Can I just add to that, though? Does the agency have some kind of an obligation to make sure this 50 miles per hour is appropriate for this kind of hazardous material, given the unprecedented danger that is posed by an 80-car train full of LNG using a tank car that's never been tested for safety before? Can the agency just default to 50 miles per hour without looking to see if this voluntary standard is even the correct one for this type of transport? So, even setting aside the fact that, to the best of FEMSA's knowledge, railroads are complying with it. But even setting that aside, Your Honor, 50 miles per hour is also the standard, the speed limit that FEMSA does mandate for poisonous by inhalation, for trains carrying hazardous materials that are poisonous by inhalation. It's also the speed limit mandated for the high-hazard flammable trains, the ones with 8,100 cars of crude oil or ethanol. I guess my question is just that, can you assume that that's the right level for this sort of previously unknown situation where we could have, like, an 80-to-100-car train full of LNG with the risks that we've been discussing this morning? Is it okay or is it arbitrary and capricious to assume that? I don't—I think FEMSA acted reasonably here in evaluating the— But did they evaluate, like, this particular substance versus the others in terms of the, I guess, the speed that would be safe to transport it? Not to my knowledge, Your Honor. But I also should note that FEMSA here was saying— But so why is that reasonable? Because, Your Honor, of FEMSA's long expertise in the field of hazardous materials regulation. And it's— They didn't exercise expertise if they didn't even compare it. It doesn't sound like they even thought about it, that this particular substance could be different from the others. Well, FEMSA thought very hard about LNG as compared to other materials. So I apologize if I've communicated otherwise, but it compared— But in terms of the safety of the speed with which you transport it, they didn't consider that. That seems to me a risk of derailment of the 80-car LNG thing. It's very different from the two- or three-car ethylene car. It's, like, a completely different thing. So maybe you want to go a little bit slower if you've got the 80 cars of LNG. Well, so there, then, the comparison for FEMSA was the crude oil or ethanol trains that— Were not Hiroshima bombs. I can't speak to the accuracy of the Hiroshima bomb ethanology. And one thing, Diane, you said FEMSA, to the best of its knowledge, thought folks would comply with the 50-mile-per-hour speed limit. And what I want to understand is, what was the knowledge that was the best of their knowledge? What information did they have? Other than that, what I'm aware of—I need to speak in supplements— is that this association has a voluntary standard for its members of— Sorry, it's a 50- or 55-mile-per-hour. And that's— 50. Right, so 50 miles per hour. What other knowledge did you have? FEMSA worked on this rule with the Federal Railroad Administration, which regularly reviews railroads and the industry practice requirements. The document called OT55, which is what specifies the 50-mile-per-hour limit, is incorporated into railroad operating rules. Incorporated as voluntary or mandatory? Railroads have to comply with their operating rules, and FEMSA and the Federal Railroad— Federal operating rules are—there's a voluntary limit. There's two ways of incorporation. You could take them as voluntary and incorporate it as mandatory, a 50-mile-an-hour cap, full stop. Or it could be, as part of your operating rules, there's a voluntary limit of 50 miles per hour. And so if you've incorporated it as voluntary, you just haven't changed anything. In my view. Your Honor, the industry guidance document, OT55, says that if there are—for key trains, which is trains with 20 or more cars of—for LNG, it's—you just need one of spent nuclear fuel or poisonous by inhalation, but a key train for LNG would be 20. The maximum speed is 50 miles per hour. Didn't NTSB want that capped at 40 in high-threat areas? The NTSB may have made that suggestion, but that isn't— Did the agency address that comment? And why that—they didn't need to do that? I'm not sure, Your Honor. Any other questions? All right. Thank you very much. Or did you want to have a wrap-up sentence here? But otherwise, I will echo Judge Randolph's request for this information about whether we should even be deciding this case. Yes, Your Honor, we will file something in writing. I just wanted to note a sensitivity. If the court is inclined to rule against the United States, PHMSA has, in the past, had to require a particular packaging that has never been tested or built before because it knew that packaging was safer than what was already in use. And if the court issues a ruling that requires certain amounts of testing or data before packaging can be allowed under the hazardous materials, Transportation Act, that could have negative consequences for PHMSA's very important safety mission. Thank you. Thank you. Okay, Mr. Marshall, we'll give you two minutes. Thank you, Your Honor. For the voluntary speed limit to even apply, it doesn't apply if you have 19 of these LNG tank cars in a row or 34 spread throughout the contest. In that case, there's not even a voluntary speed limit. It only applies if there's 20 in a row or 35 spread throughout the contest. On the route planning requirements, there's no binding requirements to not go in any specific places. It's an analysis. It's a consideration. You can still go through urban areas after you do that analysis. And so you can still have LNG unit trains going through major urban areas under this rule. Regarding pressure release devices, they will only work if they're upright. It's in the record, if you look at Joint Appendix 427, that if a tank car gets overturned on side or whatever, which often happens in derailments, they do not work. It requires that they be upright. The reference to JA459 doesn't say anything about them working if the tank car is overturned. It refers to the slightly more complicated nature of the pressure release devices of the DOT 113 tank car and regarding the fittings and the risk of liquid leak. It does not address or even hint that pressure release devices will work if they are overturned. Can I ask you just one more thing? When do you think this is first going? When do you think this first shipment of LNG in one of these new cars could happen? Assuming they don't suspend it and don't amend it. After the rule springs back into effect in 2025. We know from Finsa and- There's tanks built. These new cars are already built. Well, yes, we know that they're being built. I mean, as Finsa said- Built is different than- Yes, they've been built. Yes, they have been built. They're sitting out there on the sale lot. Finsa believes that they have been built for ethylene and that they know that there was interest in other orders. That was of 2023. There's nothing in the record since then about how many have actually been constructed since then and how many are available to ship LNG, but we know that energy transport solutions intend to use it. Their new special permit to use the existing DOT-113 tank car was denied, and so they said that they have to rely under this rule. When does that start? Are they having to use it right now, then? Or when does their new permit- No, no, it's expired, so they can't use the special permit to transport LNG under the DOT-113 existing tank cars. Do they have a permit to do it under this new tank car, and are they doing it? Well, they wouldn't need a permit because there's no permits required under this rule. Until the rule, until 2025. Right, okay. No, they're not doing it. I understand your question now, Your Honor. I apologize. There is no special permit to use this tank car- Right now. Right now for energy transport solutions. Any other questions? Thank you, Your Honor. All right, Mr. Renci, we'll give you the same two minutes. Thank you, Your Honor. The NHPA regulations are clear that Indian tribes get special treatment in the consultation analysis. Section 800.2 says that the federal government has a unique legal relationship with Indian tribes, that consultation with Indian tribes should be conducted in a sensitive manner, respectful of tribal sovereignty. Consultation with an Indian tribe must recognize the government-to-government relationship between the federal government and Indian tribes, and consultation with Indian tribes should be conducted in a manner sensitive to the concerns and needs of the Indian tribe. What happened here, a handful of emails sent over a few weeks, offering an agency lawyer with no decision-making authority, while three years into the rulemaking proceeding, a few months before the final rule was published, did not comply with the standards there. And the last point I want to make is, I talked about sending letters, and how in all these other cases, letters were sent, and Judge Miller, you asked me, you know, what are they supposed to do if they're sending emails that aren't being responded to? They could have done what happened in every one of these other cases, which is if the staff-level employee who was offering the agency lawyer for consultation didn't think his emails were being responded to fast enough. The agency could have sent a letter to the tribe formally invoking consultation. And that should have happened. More was required. Was the tribe denying that it got the emails? No, the tribe is not denying that it got the emails. We're saying that this was not... Sending a few emails over a few weeks is not conducting consultation in a manner respectful of tribal sovereignty and recognizing the special relationship between two sovereigns. Thank you very much. This case is submitted.
judges: Millett; Pan; Randolph